951 F.2d 348
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
BANK ONE OF COLUMBUS, N.A., Plaintiff-Appellee,
v.
Theresa BUTTS, Defendant, Third-Party Plaintiff-Appellant,
v.
UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,
Third Party Defendant-Appellee.
 No. 89-3703.
 United States Court of Appeals, Sixth Circuit.
 Dec. 11, 1991.
 
 Before BOGGS, Circuit Judge, LIVELY, Senior Circuit Judge, and CLELAND, District Judge.*
 PER CURIAM.
 
 
 1
 This action began as a foreclosure action by Bank One of Columbus against Theresa Butts, the mortgagor of a mortgage held by Bank One. The mortgage was guaranteed by the Federal Housing Administration ("FHA"). See 12 U.S.C. § 1707 et seq. Pursuant to 12 U.S.C. § 1715u, the Department of Housing and Urban Development has the authority to acquire mortgages in order to avoid foreclosure. Essentially the statute allows HUD to give breathing room to people suffering temporary setbacks. Butts requested this relief from HUD, claiming that she defaulted on her mortgage because she was sick, but HUD refused. Therefore, after the filing of the foreclosure action by Bank One, Butts filed a third party complaint against HUD, alleging that its decision was arbitrary and capricious. The district court upheld HUD's determination, and entered judgment against Butts. We believe that the record admits of only one conclusion, that HUD acted arbitrarily. Accordingly, we reverse the decision of the district court.
 
 
 2
 * Butts has been employed since 1976 by Interstate Brands Corporation (Butternut Bread) where she currently works as a baker. In June 1983, Butts purchased a two-family home. She took out a mortgage, financed by the Chemical Mortgage Company, in the amount of $45,100.[1] Butts's income remained fairly steady from 1984 until 1986. In 1984, she earned a bit over $19,000; by 1986, her income was somewhat over $22,000. During the first several years of her mortgage, she made her payments in a generally prompt and timely fashion.
 
 
 3
 In 1986, however, Butts missed some payments. She claims that she missed some work during this period due to her asthma problem. This, according to Butts, set her behind. Her payments during the year 1986 could not be characterized as regular; it is obvious that she teetered somewhat financially during this period. Nonetheless, Butts did manage to catch up after falling behind. After missing some work early in 1986, she gradually paid more during the last several months of 1986 and first several months of 1987. In late April and early May 1987, Butts made two large payments. With those payments, she was caught up to May 31, 1987. However, she missed the payment due June 1, 1987.
 
 
 4
 During the month of June, Butts's asthma became much worse. She missed seven nonconsecutive days of work in June, resulting in a 33% reduction in her income for that month. She was unable to work at all in the month of July, and, accordingly, had no income for that month. She was hospitalized for asthma at the end of the month. Her sick leave benefits, however, did not begin until November. After taxes, her sick leave benefits were about $470.00 per month. Her mortgage payments alone were $507 per month. Her total income for the year 1987 was reduced about in half, to $11,564.62.
 
 
 5
 In addition to the mortgage expenses, Butts had a number of other expenses. She had taken out a number of loans. Her monthly payments included $100 per month for carpets,[2] $123.54 for kitchen remodelling, and $10 per month for her Visa card.[3] In addition, on June 5, 1987, Butts purchased a Chevrolet Nova for $9,000. The monthly payment for the car was $190.78 per month. J.A. at 162.
 
 
 6
 Butts missed both the June and July payments, and she was considered to be in default after July. Because of her reduced income, she was unable to make up the payments as she had done in the past. In August, Butts began the process of asking HUD to take her mortgage. The bank recommended against it, and, subsequently, HUD turned her down. HUD's stated rationale was that she had begun to miss payments prior to losing income because she was out of work. Further, HUD maintained that she had overspent.
 
 
 7
 With HUD and Butts unable to come to an accommodation, Bank One filed a foreclosure action in state court. Butts filed a third-party complaint against HUD. HUD then removed the matter to federal court.[4] A magistrate recommended in favor of HUD, and the district court, after de novo review, adopted the conclusion of the magistrate. This appeal followed.
 
 II
 
 8
 HUD has promulgated regulations governing the mortgage assignment program. The regulations provide, in relevant part:
 
 
 9
 (a) The Secretary will accept assignments of mortgages insured under this part in order to avoid foreclosure when the following conditions are met:
 
 
 10
 (1) The mortgagee has informed the mortgagor that it intends to foreclose the mortgage.;
 
 
 11
 (2) At least three full monthly installments due on the mortgage are unpaid after application of any partial payments which may have been accepted but not yet applied to the mortgage account.
 
 
 12
 (3) The property is the mortgagor's principal place of residence. This criterion may be waived by the Secretary if the property has been leased or rented and the rental income has been applied to the mortgage delinquency or to effect repairs necessary to maintain the property in a safe and habitable condition or if such waiver is determined to be in the best interest of the Department.
 
 
 13
 (4) The mortgagor does not own other property subject to a mortgage insured or held by the Secretary. This criterion may be waived by the Secretary if the income from such other property is the mortgagor's principal source of income.
 
 
 14
 (5) The mortgagor's default has been caused by circumstances beyond the mortgagor's control which render the mortgagor unable to correct the delinquency within a reasonable time or make full mortgage payments.
 
 
 15
 (6) There is a reasonable prospect that the mortgagor will be able to resume full mortgage payments after a period of reduced or suspended payments not exceeding 36 months and will be able to pay the mortgage in full by its maturity date extended, if necessary, by up to ten years.
 
 
 16
 24 C.F.R. § 203.650(a) (emphasis added). These regulations are mandatory in nature; if Butts meets their requirements, HUD must assume her mortgage. HUD only claims that Butts fails to meet number 5. It does not take issue with the other five. HUD claims that it was Butts's profligate spending that caused her default, not her illness.
 
 
 17
 We review the decision of HUD under 5 U.S.C. § 706(2)(a), which give us the power to reverse only if the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Western & S. Life Ins. Co. v. Smith, 859 F.2d 407, 410 (6th Cir.1988). We cannot reverse unless we believe that HUD has committed "a clear error in judgment." Ibid. We must presume that the agency acted correctly, especially within its sphere of expertise. Ibid. The statute gives HUD broad discretion to implement federal housing policy. Ibid.
 
 
 18
 Nonetheless, we believe that HUD has made a clear error in its judgment. In Smith, the mortgagor claimed that he missed his payments because of illness. Yet, that record was devoid of any evidence of real illness. All he had was a note from his doctor saying that he had a history of "not feeling well." Id. at 409. The mortgagor alluded to certain "mental problems stemming from his childhood," but he did not elaborate on or document them. Ibid. Here, by contrast, the record contains ample evidence that Butts was genuinely ill, including her medical records.
 
 
 19
 HUD does not seriously dispute that she was ill during the relevant time period. HUD begins by attempting to shorten the relevant time span. HUD invokes the definition of "default" from 24 C.F.R. § 203.331:
 
 
 20
 For purposes of this subpart, the date of default shall be considered as 30 days after--
 
 
 21
 (a) The first uncorrected failure to perform any obligation under the mortgage; or
 
 
 22
 (b) The first failure to make a monthly payment which subsequent payments by the mortgagor are insufficient to cover when applied to the overdue monthly payments in the order in which they become due.
 
 
 23
 (emphasis added). Thus, according to HUD, Butts defaulted on July 1, thirty days after her missed payment.[5] HUD therefore maintains that all evidence regarding events taking place after July 1 is irrelevant to ascertaining the real cause of her default. The problem with using this particular regulation, however, is that it, by its very terms, applies only "[f]or purposes of this subpart." Section 203.331 is in subpart B, relating to the contract between FHA and the bank, while § 203.650 is in subpart C, relating to debt servicing. Accordingly, § 203.331 does not define "default" for purposes of § 203.650.[6] 24 C.F.R. § 203.650(a)(2) requires that the debtor have missed at least three monthly payments before HUD is even allowed to assume the mortgage. We believe that it would be anomalous to require that the mortgagor be three months in arrears to be eligible for the program, but then not consider any reasons that occurred after the first month of arrearage. Accordingly, we believe that HUD's time frame is too narrow, and that it should have considered whether Butts's failure to pay over the entire three-month period was her fault.
 
 
 24
 HUD grudgingly concedes that Butts did, in fact, become ill. It also concedes that financial loss due to illness would constitute a circumstance beyond her control. It argues, however, that her illness was not the proximate cause of her default. In essence (although HUD does not put it this way) HUD is arguing that her default was causally overdetermined. That is, HUD seems to be arguing that although her illness could have caused the default, she would have defaulted even had she not become ill.
 
 
 25
 HUD initially maintains that the default (missing the June payment, as HUD would have it) occurred prior to the illness. It certainly is true that she missed a payment prior to becoming ill. Her initial delinquency may indeed have been her fault. Default, however, is a continuing condition. Butts's failure to cure the delinquency is what allowed the delinquency to mature into default. She missed the June 1 payment for whatever reason, and then she was unable to make that payment--or the July or August payments--because she was sick. There is simply no controversy that she suffered a 33% reduction in income in June, and that she had no income whatsoever in July.
 
 
 26
 HUD also argues that Butts's profligate spending, not her illness, caused her to default. We do not believe that this is an accurate characterization. Based on the somewhat fragmentary financial information we can glean from the record, we conclude that Butts had a monthly after-tax disposable income of $1435 ($1127 in take-home pay[7], $108 in savings not included in her net pay and $200 per month in rent from leasing part of the home) J.A. at 161. Her monthly expenses include payments of $123.54 per month to pay for a loan for kitchen remodelling, and $100.00 per month for carpeting. J.A. at 162. These loans were incurred in 1985, long before the default here.
 
 
 27
 What seems to bother HUD the most, however, is the car. The timing of the car purchase--June 5, 1987--was somewhat unfortunate. HUD contends that she, in effect, decided to purchase a car rather than pay her mortgage. HUD believes that she could have purchased a cheaper car, or taken public transportation. There is no indication, however, that public transportation was available (or safely available) to get her to and from her workplace, where she works the night shift. The district court held that HUD had not been made aware that she needed a car to go to work, at night, but that there is at least one reference in the administrative record that belies this contention.
 
 
 28
 In any event, the car that she purchased was a relatively modest and utilitarian vehicle. Her payments were only $190.78 per month. Her total expenses--including the loans discussed above, utilities, food, telephone bills, Visa bills,[8] etc., as reflected on the information given to HUD, total close to $900 per month. Together with the mortgage, this is almost exactly equal to her income. Although she would have been on a very tight budget, Butts had previously demonstrated an ability to scrape by on barely enough. Thus, we are firmly convinced that but for her illness, she would not have defaulted on the mortgage payments.
 
 III
 
 29
 The decision of the district court is REVERSED. The case is REMANDED to the district court, with instructions to enter judgment in Butts's favor.
 
 
 30
 CLELAND, District Judge, dissenting.
 
 
 31
 The Secretary of Housing and Urban Development (HUD) determined that an assignment of appellant's mortgage should not be accepted, and the only issue before this Court on appeal is whether that determination was arbitrary, capricious, or an abuse of discretion and thus--or for other reasons--contrary to law. After reciting the factual history of the case, with most of which I agree, the majority concludes that the record "admits of only one decision"--that the Secretary made a clear error in judgment. I must dissent.
 
 
 32
 The Secretary relied on 24 C.F.R. § 230.650(a)(5) in determining to not accept assignment of appellant Butts's mortgage. Subsection (a)(5) provides that the Secretary will accept an assignment "when the mortgagor's default has been caused by circumstances beyond the mortgagor's control which render the mortgagor unable to correct the delinquency within a reasonable time or make full mortgage payments." In order to determine when default occurred, the Secretary referred to §§ 230.330 and 230.331 and concluded that, because Butts did not make her June 1, 1987 payment, she was in default as of 30 days later: July 1.
 
 
 33
 The gravamen of the Secretary's argument is that, under the Regulations, it was required to consider only those circumstances that led to appellant's default and not those conditions that kept her in default. Although the Secretary admits that Butts's illness caused a loss of income in June, the Secretary determined that the June illness was not the salient circumstance causing default since she had missed her payment before she missed her work. Rather, the Secretary concluded that default was due to her poor financial management--purchasing an automobile, thereby adding to an already high debt load--and thus was not caused "by circumstances beyond the mortgagor's control."
 
 
 34
 The majority takes the Secretary to task for attempting to shorten the time span appropriate to the determination of when default occurred. The majority opinion correctly notes that 24 C.F.R. § 203.331 applies to subpart B of the Regulations, and takes great pain to point out that subpart B relates to the contract between FHA and the lending bank, distinguishing § 203.650, in subpart C, which relates to debt servicing. The significance or necessity of this subpart distinction to the majority reasoning is not entirely clear to me. Nonetheless, I cannot understand how the Secretary can be said to have "abused his discretion" or to have been "clearly in error" to rely on such a subpart B definition in view of the absence of a definition in subpart C. This is especially so in light of several references in subpart B that require an analysis under subpart C. (See, e.g. §§ 203.340, 342, 350, 355, 402(a), and 438(c).)
 
 
 35
 In any event, the subpart B/subpart C distinction is unnecessary in view of subpart B § 203.330, from which the Secretary determined the time of default and the text of which challenges the majority's observation that "default ... is a continuing condition." Section 203.330 states, albeit more generally than other provisions, that "if the mortgagor fails to make any payment, or to perform any other obligation under the mortgage, and such failure continues for a period of 30 days, the mortgage shall be considered in default for the purposes of this part." (emphasis added). Default need not be construed as a continuing condition. From this section, the Secretary was free to determine that, while the delinquency which underpins default must be "continuing", once default arrives it is there to stay.
 
 
 36
 "This part" of course refers to Part 203--Mutual Mortgage Insurance and Rehabilitation Loans, which encompasses subparts A, B and C. A plain reading of this section easily allows an agency conclusion that the date of default arrived on July 1st, 30 days after Butts failed to make her June payment. In my judgment, it cannot be said that the Secretary was "clearly in error" to have come to this date-of-default conclusion.
 
 
 37
 The standard of review, correctly illuminated in the majority opinion, is a deferential one which presumes the validity of the agency's decision within its sphere of expertise. Western & Southern Life Insurance Co. v. Smith, 859 F.2d 407, 410 (6th Cir.1988). Broad discretion is due the agency as it implements federal housing policy. Ibid. In view of this standard, I cannot conclude that the Secretary abused his discretion in reviewing only those circumstances which preceded the default, and not those which sustained it. Stated another way, the majority's "belie [f] that HUD's time frame is too narrow, and that [HUD] should have considered whether Butts's failure to pay over the entire three-month period was her fault" (Majority Opinion at 6) (emphasis added) is merely its expression of a regulatory interpretation preference, the wisdom of which I might agree with in a general sense, but in which I cannot join in order to find an abuse of agency discretion.
 
 
 38
 Nor can I agree with the majority's analysis to the extent it is built on a foundation that "[i]t makes just as much sense to say that the default is a continuing condition--and that the relevant causal question is why it continues rather than why it began in the first place." (Majority Opinion--Fn 6) (emphasis added).
 
 
 39
 The issue is not what a judge later believes the agency "should" have done, or whether an alternate interpretation makes "just as much sense" as the one reached by the agency. Indeed, with the same stroke used to note that the the majority's interpretation "makes just as much sense" as the Secretary's, there is an equation of these alternate views, necessarily saying that the Secretary's interpretation is as good as the majority's. This does not appear to be a sturdy platform from which to locate an abuse of agency discretion.
 
 
 40
 From this record I cannot say that the agency's determination under subsection 650(a)(5) was either arbitrary, capricious, an abuse of discretion or contrary to law. The record indicates that Butts's monthly after tax income was approximately $1240.00. (JA-161). Her listed monthly expenses before she committed to purchase the car totaled $1217.00. (JA--162). With a margin of only about $23 a month, the record supports a conclusion that Butts was perched unsteadily at a financial precipice. When she added a $190.00 car payment to her monthly outflow, she took a voluntary leap into this chasm of debt. While it is true that on the way down she became ill, this later illness in no way equates with factors "beyond her control" conspiring to push her over the edge to begin with.
 
 
 41
 Accordingly, the Secretary's determination that the default here was caused by unwise personal financial management was not clearly in error, and from the contrary interpretation reached by the majority I respectfully dissent.
 
 
 
 *
 The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 The mortgage ultimately was assigned to Bank One
 
 
 [2]
 HUD repeatedly implies that these carpets were a luxury item. Butts claims, however, that she needed to buy the carpets because a water pipe burst, destroying the old carpets. There is nothing on the record to contradict her version, and the record does indicate that she made this information available to HUD. J.A. at 162
 
 
 [3]
 In addition, she listed on the form given to HUD $50 per month for dental bills. Her total balance, however, was listed at $110. Unless her dentist is also a loan shark, she would have had that paid off in a few installments. Accordingly, we do not list the payment for the dental bill in her regular payments
 
 
 [4]
 This case was filed in state court after June 19, 1986, and, accordingly, the district court had jurisdiction pursuant to 28 U.S.C. § 1441(e). Prior to that date, there would have been a jurisdictional problem. See Federal Nat'l Mortgage Ass'n v. LeCrone, 868 F.2d 190 (6th Cir.), cert. denied, 493 U.S. 938 (1989)
 
 
 [5]
 HUD asserts that the administrative record demonstrates that her delinquency began in May, not June. HUD's reference to the record refers us to a form that contains a blank labelled "Paid through ______" The date, handwritten on the line, is May 1, 1987. This could conceivably mean that Butts was paid through the end of April, up until the May 1 payment. The more likely interpretation, however, seems to us to be that she was paid through the May 1 payment. This would put the next (unpaid) payment on June 1. In any case, regardless of what the form says, the financial records (insofar as they are legible in the copies supplied by HUD to this court) reveal that she was paid up through the end of May. J.A. at 177. In oral argument, HUD agreed that she was paid up through the end of May
 
 
 [6]
 Even if the definition did apply, we are not sure that HUD's suggested result would follow. 24 C.F.R. § 203.333 allows the mortgagor to cure a default prior to the completion of foreclosure proceedings. It would make just as much sense to say that the default is a continuing condition--and that the relevant causal question is why it continues rather than why it began in the first place
 
 
 [7]
 This figure differs from the Dissent's figure of $1240 (Dissent, p. 4), because we consider that a person paid weekly receives 4 1/3, rather than 4, paychecks monthly. Butts reported take-home pay of $260 weekly
 
 
 [8]
 Butts had only one credit card on which she owed money at the time of her application for a mortgage assignment, and her monthly payments on that card were only $10. The balance, at the time of the application, was $190